UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
EVA BERGER-ROTHBERG,

                Plaintiff,

- against -

CITY OF NEW YORK, and NEW YORK
CITY DEPARTMENT OF EDUCATION,

                Defendants.
------------------------------------------------------------X

**MEMORANDUM & ORDER**
07-CV-1878 (RRM)(SMG)

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
★ MAR 2 3 2011 ★
BROOKLYN OFFICE

**MAUSKOPF, United States District Judge.**

Plaintiff Eva Berger-Rothberg ("Plaintiff") brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law §§ 296 *et seq.* ("NYSHRL"), the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 *et seq.* ("NYCHRL"), and New York state common law, asserting claims for hostile work environment, retaliation, and negligence against defendants the City of New York and the New York City Department of Education ("DOE") (together, "Defendants"). On April 1, 2010, the Defendants moved for summary judgment on all claims. For the reasons set forth below, Defendants' motion is GRANTED in part and DENIED in part.

## BACKGROUND[1]

Plaintiff self-identifies as a white, Jewish woman. (Defs.' 56.1 Stmt. ¶ 1, Pl.'s 56.1 Cntrstmt. ¶ 1.) In 1987, she was hired by the DOE as a special education teacher. (Defs.' 56.1 Stmt. ¶ 2.) Plaintiff was employed by the DOE as a special education teacher for approximately eighteen years. (*Id.*) Before applying for a position with the DOE, Plaintiff had received

---

[1] The following material facts are taken from the Local Rule 56.1 statements submitted by the parties and the affidavits and exhibits submitted in connection with Defendants' Motion for Summary Judgment and Plaintiff's Opposition thereto. The facts are undisputed except as noted.

1

substantial training in special education, including instructions on how to "deal with," "cope with," and "relax" "problem children." (*Id.* ¶ 3.)

On October 11, 2005, Plaintiff transferred to Middle School 226 in Queens, New York ("MS 226"). (*Id.* ¶ 8.) During the 2005–2006 school year, MS 226 was split into four academies, each located on a different floor at MS 226, and each with its own Assistant Principal ("A.P."). (*Id.* ¶ 9.) A.P. James Buterakos was responsible for the Renaissance Academy, located on the fourth floor at MS 226. (*Id.* ¶ 10.) A.P. Nancy O'Dwyer was responsible for the Special Education Department at MS 226. (*Id.* ¶ 11.)

Plaintiff was assigned to a seventh grade Modified Instructional Services 2 ("MIS 2") class in room 419, located on the fourth floor of MS 226, and comprised mostly of severely emotionally disturbed children. (*Id.* ¶ 13; Pl.'s 56.1 Cntrstmt. ¶ 13.) Plaintiff claims that Sonia Nieves, the Principal at MS 226, warned her that she was assigned to a "rough class." (Berger-Rothberg Dep. at 90–91.) Plaintiff estimates that, although she was responsible for ten students in total, an average of seven students was present in her classroom at any given time. (Defs.' 56.1 Stmt. ¶ 13; Pl.'s 56.1 Cntrstmt. ¶ 15.) Two paraprofessionals were also assigned to Plaintiff's classroom: Cecelia Donovan was responsible for one student in particular, while Chander Anand attended to the class as a whole. (Pl.'s 56.1 Cntrstmt. ¶ 13.) Another special education teacher, Barbara Willis-Elliot, was also assigned to Plaintiff's class for two or three periods a day to assist with classroom management. (*Id.*) Finally, a School Safety Agent, Officer Lowe, was assigned to the fourth floor of MS 226. (Defs.' 56.1 Stmt. ¶ 14.)

Willis-Elliot, who had sixteen years of experience at the time she worked with Plaintiff, testified that Plaintiff often argued with her students. (*Id.* ¶ 23.) Willis-Elliot suggested that Plaintiff refrain from "fuel[ing] the fire" by "demean[ing] the children" or giving them reason to

2

argue with her. (*Id.* ¶¶ 23, 29.) For example, Plaintiff would allegedly respond to verbal provocation by her students with inappropriate remarks. (*Id.* ¶ 24.) Willis-Elliot offered a characteristic example of the disorderly atmosphere in Plaintiff's classroom:

> [Students] would say 'White B[itch]' to her, and then she would in turn, turn around and say something derogatory to them. Then it becomes a one-on-one verbal confrontation between her and the student, and then the other kids start, because nobody is paying attention to them, except for maybe the paraprofessional in the class and myself. Then the other children get off task, and they would all start joining in, and it would become a free-for-all.

(*Id.* ¶ 25.) Willis-Elliot testified that when she witnessed this type of scene, she would place herself between Plaintiff and the student, each of whom "would back off." (*Id.* ¶ 26.)

Willis-Elliot and the two paraprofessionals assigned to Plaintiff's class attempted to develop strategies for Plaintiff to use to improve discipline in her classroom, including rewards, seating reassignments, calling parents, and arranging parent conferences. (*Id.* ¶ 27.) Plaintiff testified that she implemented many of these strategies, but their effectiveness diminished over time. (Pl.'s 56.1 Cntrstmt. ¶ 27.)

Donovan, a paraprofessional, also testified that Plaintiff would "put the kids down":

> [Plaintiff] would tell them that they would never amount to nothing [sic] and that the only thing they be doing is flipping burgers and they could flip her one, and then she would brag about what she had, like a big house. I make a six figure number, I got this and I got that and I got my degree and, you know, having the kids thinking that they can't get theirs, so the kids used to tell her, you don't know what I'm going to be when I grow up . . . they got angry and then after a while, they start cursing her.

(Defs.' 56.1 Stmt. ¶ 28.)

The record indicates that Plaintiff's class was extremely disruptive, threatening, and often dangerous. For example, Plaintiff testified that the students would throw books in the classroom, often at Plaintiff. (Berger-Rothberg 50-H Hearing Tr. at 32; Berger-Rothberg Dep. at 150;

3

Anand Dep. at 23–24, 41–42.) Students allegedly began throwing books on a daily basis on October 17, 2005, six days after she arrived at MS 226. (Berger-Rothberg 50-H Hearing Tr. at 32.) Although A.P. Buterakos eventually removed the books from Plaintiff's class on February 8, 2006, almost four months after students began throwing them, the parties dispute when Buterakos received notice of the book throwing. (*Id.* ¶ 31; Pl.'s 56.1 Cntrstmt. ¶ 31.) Plaintiff testified that S.C.,[2] one of her students, threatened her numerous times. (Berger-Rothberg 50-H Hearing Tr. at 24.) Willis-Elliot testified that the students would "get up in her face, make close contact . . . to intimidate her . . . and yell at her, yell racial slurs." (Willis-Elliot Dep. at 23–24.)

Plaintiff testified that virtually from the start, her students called her "Jew bastard" and threw books at her, causing her to feel that she was in danger. (Berger-Rothberg Dep. at 87.) Anand, one of the class paraprofessionals, also said she felt afraid when the students would throw books or push down desks and chairs in the classroom. (Anand Dep. at 26.) Both Anand and Donovan testified that they reported the book throwing to A.P. Buterakos. (*Id.* at 26–27; Donovan Dep. at 42.) On a regular basis, Plaintiff's students said to her: "fuck you, Jew," "white Jewish bastard," "white bitch," "bitch," "fuck you," "I will f[uck] you up," "you bitch," "Jew bastard," "fucking Jew," "white Jew," "Hitler did not kill enough Jews," and "Jews don't deserve to live." (Berger-Rothberg Dep. at 118–24; Willis-Elliot Dep. at 21–23; Ex. 18.) On December 1, 2005, one of Plaintiff's students, D.P., sprayed her in the eye with air freshener and then hit her with the can. (Pl.'s Aff. in Supp. of Mot. for Summ. Judg., Ex. 24.) Plaintiff testified that in January 2006, S.C. and N.B. wrote "Bitch" in red marker and vandalized her classroom. (Berger-Rothberg Dep. at 135.) Plaintiff testified that "Mr. Buterakos came in and saw the room all tore up." (*Id.*)

---

[2] For privacy reasons, the Court identifies minors only by their initials.

4

A. December 23, 2005 Incident

On December 23, 2005, Plaintiff received highly inappropriate, sexually suggestive advances from two of her students. (Defs.' 56.1 Stmt. ¶ 43.) One student, B.E., surprised Plaintiff and rubbed his penis against her body. (*Id.*) Another student, S.C., either pressed his lips against, or stuck his tongue into, Plaintiff's ear and said something along the lines of "Do you want to be my friend?" or "Do you want to have a good time?" (*Id.*; Pl.'s 56.1 Cntrstmt. ¶ 43.)[3] Plaintiff reported the incident to the Principal Nieves, who immediately called the police. (Defs.' 56.1 Stmt. ¶ 47; Pl.'s 56.1 Cntrstmt. ¶¶ 43, 47.) Within an hour, the students, their parents, Plaintiff, and Principal Nieves were gathered in the principal's office to discuss the incident. (Defs.' 56.1 Stmt. ¶ 47.) Principal Nieves testified that when she presented Plaintiff with the option of removing B.E. and S.C. from her classroom permanently, Plaintiff's "words pretty much were [that] she didn't want her sweethearts, her babies removed from her class." (*Id.* ¶ 49.)

Plaintiff claims that she was frightened, overwhelmed, and in shock during her meeting with Principal Nieves. (Berger-Rothberg Dep. at 114–15.) Plaintiff testified that "all Ms. Nieves kept saying is, do you want to call the police, do you want to call the police." (*Id.* at 115.) Plaintiff testified that although she wanted the students arrested, she was confused, and focused on the fact that she had a flight to catch that night. (*Id.* ¶ 51.) Moreover, she worried that Principal Nieves "wanted [her] out of the school," and would consider her a troublemaker if she pressed charges. (*Id.*) Plaintiff testified that she made the decision not to press charges on the advice of Ed Mergenthaler, who told her not to "cause more of a havoc [sic]." (Berger-Rothberg

---

[3] Psychological evaluations of S.C., one of Plaintiff's most troublesome students, indicated that, at his prior school, he was "belligerent" and "verbally and physically aggressive towards his teacher and peers when the teacher sets limits and enforces the rules." (Defs.' 56.1 Stmt. ¶ 62.) A Functional Behavior Assessment Worksheet for S.C. also stated that he exhibited "[a]gressive verbal response to teacher directive." (*Id.* ¶ 63.)

Dep. at 115.) Thus, Plaintiff did not press charges and both students received a five-day, in-school suspension, which Principal Nieves believed was the maximum penalty permitted under the DOE's Discipline Code. (Defs.' 56.1 Stmt. ¶¶ 48, 50.)

On January 13, 2006, A.P. O'Dwyer performed a formal classroom observation of Plaintiff, and rated her unsatisfactory. (*Id.* ¶ 16.) According to Principal Nieves, this formal observation provided the sole basis for giving Plaintiff an unsatisfactory year-end rating. (*Id.* ¶ 18.) Plaintiff worked at MS 226 from October 11, 2005 until February 8, 2006. (*Id.* ¶ 20.)

### B. January 19, 2006 Incident

On January 19, 2006, Plaintiff's students were allegedly throwing books at her, calling her "Jew Bastard," and saying that "Hitler did not kill enough Jews." (*Id.* ¶¶ 52–54.) During period seven, Plaintiff collapsed with a severe pain between her stomach and chest. (*Id.*) Plaintiff was then rushed to Jamaica Hospital. (*Id.*) Plaintiff later submitted a request for line of duty injury ("LODI") to cover the days she missed from work: January 20, 2006 through February 6, 2006. (*Id.* ¶ 53.) Principal Nieves denied Plaintiff's LODI request because the request suggested that she collapsed during period seven, when her students were in another classroom, and hence Principal Nieves believed there was no evidence that the collapse was work-related. (*Id.* ¶ 55.) Plaintiff agrees that her students were not in her classroom during period seven, but contends that her LODI request form makes it clear that her collapse during period seven resulted from student harassment that she experienced earlier in the day. (Pl.'s 56.1 Cntrstmt. ¶ 55.)

### C. February 8, 2006 Incident

On the morning of February 8, 2006, Plaintiff's students were again throwing books, which, Plaintiff claims, prompted A.P. Buterakos to remove all of the books from the classroom.

(Pl.'s 56.1 Cntrstmt. ¶ 57.) Plaintiff testified that after A.P. Buterakos had removed all of the books from her classroom, she requested and received from him seven copies of a Harry Potter volume that she needed in order to conduct a lesson. (*Id.*) During the Harry Potter lesson, S.C. began to yell Plaintiff's name repeatedly. (*Id.*) Plaintiff testified that, in her experience, were she to interrupt the lesson and confront S.C., the chaotic atmosphere in the classroom would have escalated. (*Id.*) Thus, Plaintiff ignored S.C. and continued with her lesson. (*Id.*) Plaintiff testified that S.C. then threw a book, striking Plaintiff's left leg. (*Id.*) Plaintiff continued the lesson and S.C. threw another book. (*Id.*)

At this point, Plaintiff claims that she took out her cellular telephone and threatened to call S.C.'s mother if he did not behave himself. (*Id.*) After the December 23rd incident, S.C.'s mother told Plaintiff to call her if there were another incident. (*Id.*) Before Plaintiff had the chance to call, however, S.C. wrestled the phone away from her, twisting and injuring her right hand in the process, and threw her against the wall. (*Id.*) Plaintiff testified that S.C. then ran out of the room, and she contacted security. (*Id.*) A security officer returned Plaintiff's phone to her. (*Id.*) Plaintiff testified that S.C. returned to the classroom, threatened to kill her, and knocked her against the wall a few times. (*Id.*) Officer Lowe then removed S.C. from the classroom. (*Id.*)

Plaintiff testified that, around this time, A.P. Buterakos and A.P. O'Dwyer arrived, and Plaintiff pleaded with them to call the police. (*Id.*) According to Plaintiff, both ignored her request. (*Id.*) Plaintiff then reported to Principal Nieves' office, where she received a letter from the principal informing her that she would be disciplined for using a cellular telephone in the classroom. (*Id.*) Plaintiff then decided to go to the police station on her own. (*Id.*) Plaintiff testified that, as she was about to leave, she saw S.C. waiting for her outside. (*Id.*) While

Plaintiff ran to her car, another student managed to hold S.C. back as he attempted to approach her. (*Id.*)

Plaintiff drove to the 106th precinct and made a criminal complaint against S.C. (*Id.*) Thereafter, S.C. was arrested, prosecuted, and eventually pled guilty to criminal charges. (Berger-Rothberg 50-H Hearing Tr. at 24; Pl.'s 56.1 Cntrstmt. ¶ 59.)[4] Principal Nieves initially denied Plaintiff's LODI request for injuries sustained during the February 8, 2006 incident because Plaintiff had not provided adequate medical documentation supporting her LODI. (Defs.' 56.1 Stmt. ¶¶ 64, 65.) Once Plaintiff submitted medical documentation, Principal Nieves approved her LODI request. (*Id.* ¶ 65.) Plaintiff disputes this fact, citing a document indicating that her "supervisor" placed an administrative bar on her LODI request because the supervisor felt that Plaintiff caused the incident by making a phone call to a student's parent "in front of the entire class." (Pl.'s 56.1 Cntrstmt. ¶ 65.) Plaintiff has not worked since the February 8, 2006 incident and receives both Social Security Disability benefits and a pension from the New York City Board of Education. (Berger-Rothberg Dep. at 18–22.)

A.P. Buterakos testified that he did not consider removing Plaintiff from the class because he felt that it was possible to improve the conditions in Plaintiff's class, and that it was Board of Education policy not to remove teachers. (Buterakos Dep. at 102–03.)

D. School Administration Knowledge of Activities in Plaintiff's Classroom

As soon as the students started throwing books and calling her "Jew Bastard," Plaintiff notified an individual at the Board of Education that she felt as though she was in danger and needed to get out of the class. (Berger-Rothberg Dep. at 87.) Plaintiff told A.P. Buterakos that the students were calling her "Fucking Jew" and "Jew Bastard" in mid-October of 2005, very shortly after she began working at MS 226. (Berger-Rothberg Dep. at 127–28.) Donovan and

---

[4] The record indicates neither the crime with which S.C. was charged, nor the crime to which he pled guilty.

Anand testified that they informed A.P. Buterakos about book-throwing in her classroom before he removed the books on February 8, 2006. (Anand Dep. at 26–27; Donovan Dep. at 42.) Although he had difficulty recalling specific details, A.P. Buterakos testified that he had many discussions with A.P. O'Dwyer and Principal Nieves about Plaintiff's class. (Buterakos Dep. at 72–92.) A.P. Buterakos testified that the behavior of Plaintiff's class and her ability to maintain control of the classroom were "major concern[s]." (Id. at 83.) Plaintiff testified that although the administration provided her with assistance at first, it became increasingly unresponsive to her requests for help. (Berger-Rothberg Dep. at 96–97.) Plaintiff claims that A.P. O'Dwyer and Principal Nieves eventually ignored her entirely when she would ask for assistance with class management. (Id. at 106–09.)

After A.P. Buterakos learned that Plaintiff was having difficulties with classroom management, he began observing her class on an informal basis, sometimes once a day. (Defs.' 56.1 Stmt. ¶ 32.) He testified that Plaintiff's teaching abilities were not satisfactory and that she was having difficulty with classroom management. (Id. ¶¶ 32–33.) A.P. Buterakos was aware that Plaintiff's students were misbehaving in the extreme. For example, he knew that students (1) left the classroom without permission; (2) got into at least five fights, and perhaps as many as twenty, over the course of Plaintiff's tenure; (3) threw books; (4) needed to be removed from Plaintiff's class several times per week; (5) were uncooperative; and (6) used inappropriate language. (Pl.'s 56.1 Cntrstmt. ¶ 34.) A.P. Buterakos could recall at least one instance in which a "problematic" student, who was a "catalyst for negativity," was removed from Plaintiff's class by A.P. O'Dwyer and sent to another class. (Defs.' 56.1 Stmt. ¶ 36.) A.P. O'Dwyer also testified that she met with Plaintiff to discuss behavior modification techniques to use in the classroom. (Id. ¶ 37.)

The Dean of Discipline at MS 226, Juanita Grayson, testified that Plaintiff's students were referred to her for disciplinary reasons such as fights and inappropriate behavior. (*Id.* ¶ 38.) When these incidents would occur, Grayson would contact the parents and ask them to come in for a conference to address the student's behavior. (*Id.*) Grayson did not believe that this type of behavior was out of the ordinary considering that Plaintiff's students had "special needs." (*Id.* ¶ 39.) Grayson testified that she believes a multifaceted-approach to disciplinary problems involving special needs students is most effective: "You can't punish, punish, punish. Depending on the situation, [Plaintiff's] students were referred to guidance, conference, parent/teacher/student conferences, and in some cases they were suspended, principal suspensions." (*Id.* ¶ 40.) Grayson recalled that Plaintiff has particular difficulty with one student, J.E. (*Id.* ¶ 41.) Grayson contacted J.E.'s parents, who then met with Grayson, Plaintiff, and A.P. O'Dwyer to address J.E.'s disciplinary problems. (*Id.*)

E. Procedural Background

On May 5, 2007, Plaintiff, appearing *pro se*, filed the instant action. On June 25, 2007, Plaintiff, represented by an attorney, filed an Amended Complaint, asserting claims for hostile work environment, retaliation, and negligence under state and federal law. On April 1, 2010, the Defendants moved for summary judgment as to all claims.

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute and that one party is entitled to judgment as a matter of law. *See* Fed. R. Civ. R 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a summary judgment motion, a district court must draw all reasonable inferences in favor of the nonmoving party. *See id.* at 249 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 137 (2d Cir. 1998). Thus, the court must not "weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2007) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)). Any evidence in the record of any material fact from which an inference could be drawn in favor of the non-moving party precludes summary judgment. *See Castle Rock Entm't*, 150 F.3d at 137.

Once the movant has demonstrated that no genuine issue of material fact exists, such that it is entitled to judgment as a matter of law, then "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original). However, there must exist more than mere "metaphysical doubt as to the material facts" to defeat a summary judgment motion. *Id.* at 586. Instead, the non-moving party must present "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. Only disputes over material facts "that might affect the outcome of the suit under the governing law" will properly preclude the entry of summary judgment. *Id.* at 248; *see also Matsushita*, 475 U.S. at 586.

In discrimination cases, the merits typically turn upon an employer's intent, necessitating the exercise of abundant caution in granting summary judgment for the employer. *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). When an employer has acted with discriminatory intent, direct evidence of that intent will only rarely be available, thus "affidavits and depositions must be carefully scrutinized for circumstantial proof, which, if believed, would show discrimination." *Id.* (quoting *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994)). Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment. *Id.*

## DISCUSSION

### A. Hostile Work Environment

To make out a hostile work environment claim, a plaintiff must establish the following elements: (1) that his workplace was permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of his work environment; and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). The conduct in question "must be severe or pervasive enough to create an environment that 'would reasonably be perceived, and is perceived, as hostile or abusive.'" *Schwapp*, 118 F.3d at 110 (quoting *Harris*, 510 U.S. at 22). In other words, the first element of a hostile work environment claim requires allegations that demonstrate that the environment was both objectively and subjectively hostile and abusive. *See Gregory v. Daly*, 243 F.3d 687, 691–92 (2d Cir. 2001).

To support a hostile work environment claim, a plaintiff generally "must prove more than a few isolated incidents of [discriminatory] enmity. Casual comments, or accidental or sporadic conversation, will not trigger equitable relief pursuant to the statute." *Snell v. Suffolk Cnty.*, 782

F.2d 1094, 1103 (2d Cir. 1986) (citations omitted). However, "even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (citations omitted). In evaluating a plaintiff's claim, the court must consider "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) (citing *Harris*, 510 U.S. at 23). Whereas disparate treatment claims typically focus on discrete harms – such as hiring or termination – a hostile work environment claim requires analysis of the "workplace environment as a whole." *Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir. 2001); *see also Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (determining hostile work environment requires an examination of the totality of the circumstances).

Defendants argue that Plaintiff's hostile work environment claim fails as a matter of law because Plaintiff was allegedly harassed by her own students, rather than her supervisors or co-workers. (Def. Mem. in Supp. of Mot. for Summ. J. at 3.) Although the Second Circuit has not yet addressed the issue, *Das v. Consol. Sch. Dist. of New Britain*, 369 Fed. App'x 186, 190 (2d Cir. 2010), this Court has not identified a single decision holding that student-on-teacher harassment may not provide the basis for a hostile work environment claim. Rather, courts to consider the issue have uniformly held that such claims do not fail as a matter of law. *See, e.g., Peries v. N.Y.C. Bd. of Educ.*, 97-CV-7109 (ARR), 2001 U.S. Dist. LEXIS 23393, at *19 (E.D.N.Y. Aug. 6, 2001) (hostile work environment claim survives summary judgment where special education students harassed special education teacher); *see also Schroeder v. Hamilton Sch. Dist.*, 282 F.3d 946, 951 (7th Cir. 2002) (explaining that in Title VII context, school district

could be liable to teacher if they "knew he was being harassed and failed to take reasonable measures to prevent it" (citation omitted)); *Mongelli v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 491 F. Supp. 2d 467, 478 (D. Del. 2007) (holding that "liability for hostile work environment claims under Title VII may attach to schools that fail to address teachers' claims of harassment by students"); *Plaza-Torres v. Rey*, 376 F. Supp. 2d 171, 182 (D.P.R. 2005) ("we will not limit the reach of Title VII liability by closing the door on student-on-teacher harassment").

To prove a hostile work environment claim based on student-on-teacher harassment, a plaintiff must show "first that a hostile environment existed and second that the school board either provided no reasonable avenue of complaint or knew of the harassment and failed to take appropriate remedial action." *Peries*, 2001 U.S. Dist. LEXIS 23393, at *19. Here, Plaintiff has produced sufficient evidence for summary judgment purposes to show that she experienced a hostile work environment on the basis of race, gender, and religion. First, a jury could reasonably conclude that the constant, vicious name-calling, coupled with repeated acts and threats of violence, including at least one incident involving inappropriate sexual contact, and other abuse allegedly directed at Plaintiff by her students constituted a series of incidents "sufficiently continuous and concerted in order to be deemed pervasive," thereby "alter[ing] the conditions of the [Plaintiff's] employment and creat[ing] an abusive working environment." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) (citations and internal quotation marks omitted).

Second, there is sufficient evidence in the record such that a jury could reasonably find that school officials failed to take appropriate remedial action. Defendants argue that the administration acted reasonably in response to Plaintiff's complaints. For example, Defendants point to Willis-Elliot's peacemaking efforts, A.P. Buterakos's decision to remove the books from

Plaintiff's class on February 8, 2006, the attempts of various administrators to provide Plaintiff with class management techniques, and the fact that various students received disciplinary sanctions. Plaintiff disputes the adequacy of these actions. For instance, Plaintiff notes that A.P. Buterakos waited almost four months after the students began throwing books on a daily basis to remove the books from her classroom. Plaintiff also testified the administration cooled to her requests for class management assistance over time, just as the harassment and violence in her class intensified. The Court, however, cannot resolve this dispute of fact on summary judgment because "[t]he question of whether school officials took appropriate remedial action is a question of fact, not law." *Peries*, 2001 U.S. Dist. LEXIS 23393, at *21. Considering the totality of circumstances, *Howley*, 217 F.3d at 154, this Court finds that there are genuine issues of fact precluding a grant of summary judgment to Defendants on Plaintiff's hostile work environment claims.[5]

B. Retaliation

Title VII's anti-retaliation provision prohibits an employer from "discriminat[ing] against" an employee or job applicant because she has "opposed" a practice that Title VII forbids or has "made a charge, testified, assisted, or participated in" a Title VII "investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a). To establish retaliation, a plaintiff must show that (1) she participated in a protected activity, (2) the defendant knew of the activity, (3) an adverse employment action took place, and (4) there exists a causal connection between the protected activity and the adverse employment action. *See McMenemy v. City of Rochester*, 241 F.3d 279, 282–83 (2d Cir. 2001).

---

[5] New York courts examining claims under the NYSHRL and the NYCHRL take an analytical approach that closely parallels the analysis used for corresponding Title VII claims. *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 n.1 (2d Cir. 2000) (citations omitted). Accordingly, summary judgment is also denied as to Plaintiff's NYSHRL and NYCHRL hostile work environment claims.

Plaintiff argues that this Court should construe her retaliation claim as one for retaliatory hostile work environment. (Pl. Mem. of Law in Opp. at 19.) Plaintiff has produced evidence that she complained about the discriminatory conduct of her students to school administrators on a regular basis, beginning soon after she arrived at MS 226. This satisfies prongs one and two of the test for establishing retaliation: (1) that she participated in a protected activity, and (2) that Defendants knew of the activity. A hostile work environment itself can constitute an adverse employment action, the third prong required to establish retaliation. *See Richardson v. N.Y. State Dep't of Corr. Servs.*, 180 F.3d 426, 445–46 (2d Cir. 1999) ("harassment, if sufficiently severe, may constitute adverse employment action" for purposes of a retaliation claim), *abrogated on other grounds by Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). As discussed above, Plaintiff has produced sufficient evidence to raise a genuine issue of material fact as to whether she experienced a hostile work environment on the basis of race, gender, and religion.[6]

To establish a causal connection between the protected activity and the hostile work environment, the fourth and final retaliation prong, "some increase in the discrimination or harassment – either a ratcheting up of the preexisting behavior, or new, additional forms of harassment – must occur for the employee to make out a viable retaliation claim." *Hall v. N.Y. City DOT*, 701 F. Supp. 2d 318, 339 (E.D.N.Y. 2010) (citing *Gregory v. Daly*, 243 F.3d 687, 690 (2d Cir. 2001) (plaintiff adequately stated retaliation claim based on allegation that supervisor's harassing behavior appreciably worsened after she complained and filed a lawsuit against him)). Here, Plaintiff has produced sufficient evidence to permit a jury reasonably to find that the

---

[6] In order to establish a retaliatory hostile work environment, a plaintiff must satisfy the same standard used to evaluate conventional hostile work environment claims by showing that the incidents of harassment following complaints were sufficiently continuous and severe to have altered the conditions of employment. *See Sclafani v. PC Richard & Son*, 668 F. Supp. 2d 423, 438 (E.D.N.Y. 2009) (citing *Rasco v. BT Radianz*, No. 05 Civ. 7147 (BSJ), 2009 U.S. Dist. LEXIS 21540, at *47 (S.D.N.Y. Mar. 17, 2009)).

hostility of her work environment worsened because school administrators allowed the conditions in Plaintiff's classroom to deteriorate following her complaints to them of student harassment and violence. Plaintiff testified that the students began calling her "Jew bastard," "fuck you Jew," and "white bitch" multiple times a week from October 2005 to February 2006, when she stopped working at MS 226. Plaintiff claims that the students began calling her these names during her first or second week at MS 226, and that she immediately notified both A.P. Buterakos and A.P. O'Dwyer. Plaintiff testified that although the school administrators provided her with assistance at first, they became increasingly unresponsive to her requests for help. Plaintiff also claims that Principal Nieves liked her at first, but that soon after Plaintiff began asking for help, Principal Nieves refused to help her. Defendants dispute these facts, claiming that A.P. Buterakos and Principal Nieves gave Plaintiff as much assistance as possible. It is not permissible to resolve this dispute of fact at the summary judgment stage because the Court must not "weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2007) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)).

The record also indicates that, as time passed, the harassment and violence in Plaintiff's classroom intensified significantly following her complaints of harassment to school administrators. Plaintiff has put forth evidence that the racist, sexist, and anti-Semitic name-calling continued unabated; two students made highly inappropriate sexual advances on Plaintiff; students wrote "white bitch" on the classroom wall; a student sprayed Plaintiff in the eye with air freshener and hit her with the can; Plaintiff allegedly collapsed from the stress of constant book-

throwing and being called "Jew bastard"; and, finally, one of Plaintiff's students, S.C., physically injured Plaintiff and threatened to kill her.

On the basis of this evidence, a reasonable jury could find that the hostile work environment allegedly experienced by Plaintiff worsened because school administrators ignored her complaints about student harassment. *See Thomas v. iStar Fin., Inc.*, 438 F. Supp. 2d 348, 365 (S.D.N.Y. 2006) ("A retaliatory hostile work environment has been considered actionable when incidents of harassment following complaints were sufficiently continuous and concerted to have altered conditions of an employee's employment." (citations omitted)). Accordingly, Defendants' motion for summary judgment on Plaintiff's retaliation claims is DENIED.[7]

C. Negligence Claims

Plaintiff's state law negligence claims are barred as a matter of law by the New York's Workers' Compensation Law. *See Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir. 1997) (rejecting common law negligence claim for failing to prevent hostile work environment because New York's Workers' Compensation Law provides that the "right to compensation or benefits under this chapter, shall be the exclusive remedy to an employee . . . when such employee is injured or killed by the negligence or wrong of another in the same employ." (citing N.Y. WORK. COMP. LAW § 29(6))); *see also Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 138 (2d Cir. 2001) (citations omitted)); *Jean-Louis v. Am. Airlines*, No. 08 Civ. 3898, 2010 U.S. Dist. LEXIS 77292, at *8–9 (E.D.N.Y. July 30, 2010) ("Courts routinely dismiss workplace negligence claims, including claims based on harassment and infliction of emotional distress, in light of the exclusive remedy provision of the Workers' Compensation statute.") (collecting cases); *Sullivan*

---

[7] Retaliation claims brought pursuant to the NYSHRL are governed by the same standards as federal claims under Title VII, while those brought pursuant to NYCHRL are subject to an even "broader" standard. *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 723 (2d Cir. 2010) (citation omitted); *Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 609 (2d Cir. 2006). Accordingly, Defendants' motion for summary judgment on Plaintiff's NYSHRL and NYCHRL retaliation claims is also DENIED.

*v. Newburgh Enlarged Sch. Dist.*, 281 F. Supp. 2d 689, 709 (S.D.N.Y. 2003) (teacher was "clearly barred by New York State Worker's Compensation Law from bringing a common-law negligence claim against the district" based on sexual harassment). Accordingly, Defendants' motion for summary judgment as to Plaintiff's state law negligence claims is GRANTED.[8]

## CONCLUSION

For the reasons stated above, Defendant's summary judgment motion [Doc. No. 35] is DENIED as to Plaintiff's hostile work environment and retaliation claims, and GRANTED as to Plaintiff's state law negligence claims. In addition, on consent of the parties, all claims against the City of New York are DISMISSED. The Clerk of Court is directed to amend the caption of the case by removing the City of New York as a defendant in this case.

This matter is recommitted to the assigned Magistrate Judge for supervision of any settlement discussions, and all remaining pre-trial issues, including the preparation of a Joint Pre-Trial Order consistent with this Memorandum and Order.

SO ORDERED.

Dated: Brooklyn, New York
March 2011

s/Roslynn R. Mauskopf

ROSLYNN R. MAUSKOPF
United States District Judge

---

[8] The parties consent to the dismissal of all claims against the City of New York because Defendants concede that Plaintiff's employer was the DOE, and not the City of New York. (Def. Mem. of Law in Supp. of Mot. for Summ. J. at 25; Pl. Mem. of Law in Opp. at 21–22.) Accordingly, all claims against the City of New York are DISMISSED.